**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE  DIVISION**

SARAH JANE UNDERWOOD,     :
                                  :

       Plaintiff,          :
                                  :

v.                             :       CIVIL ACTION NO.
                                  :       2:10-CV-20-RWS

RITA HARKINS et al.,          :
                                  :

       Defendant.       :
                                  :

## <u>ORDER</u>

This case comes before the Court on Defendants' Motion for Summary Judgment [34]. After considering the record, the Court enters the following Order.

## Background

From 1973 to 2008, Edward Tucker ("Tucker") served continuously as the Lumpkin County Superior Court Clerk. (Defendants' Statement of Material Facts Upon Which There Exists No Genuine Issue To Be Tried ("DF"), Dkt. No. [34-2] at ¶ 2; Plaintiff's Response to Defendants' Statement of Material Facts ("Response to DF"), Dkt. No. [41-2] at ¶ 2). Plaintiff Sarah Jane Underwood ("Plaintiff" or "Underwood") began working for the Clerk's Office

in 1999, and Tucker promoted her to Deputy Clerk in 2004. (DF at ¶¶ 1, 8; Response to DF at ¶¶ 1, 8). Beginning in January 2005, Defendant Rita Harkins ("Harkins") also served the Clerk's Office as a Deputy Clerk. (Plaintiff's Statement of Material Facts ("PF"), Dkt. No. [41-1] at ¶ 5; Defendants' Response to Plaintiff's Statement of Material Facts ("Response to PF"), Dkt. No. [45] at ¶ 5).

In early May 2008, Tucker announced that he no longer would seek re-election for his position. (PF at ¶ 7; Response to PF at ¶ 7). Harkins announced the next day that she would run for the Republican nomination for Lumpkin County Superior Court Clerk. (DF at ¶ 4; Response to DF at ¶ 4). Shortly thereafter, Underwood announced that she would also seek the Republican nomination. (DF at ¶ 6; Response to DF at ¶ 6). Four individuals ran in the Republican primary, which was not contentious by all accounts. (DF at ¶¶ 9, 11; Response to DF ¶¶ 9, 11). Although Plaintiff finished last in the primary, Harkins advanced to a primary runoff, which she won. (DF at ¶¶ 10, 13, 15; Response to DF ¶¶ 10, 13, 15). Harkins proceeded to win the general election on August 5, 2008, uncontested by any Democratic challenger. (PF at ¶ 16; Response to PF at ¶ 16). Harkins alleges that Plaintiff afterward did not congratulate her or affirmatively offer her support, but instead only conversed

2

with Harkins about work matters. (DF at ¶¶ 19-24; Response to DF at ¶¶ 19-24).

At the time Harkins filled the Superior Court Clerk vacancy, Plaintiff's primary role was as office accountant. (DF at ¶ 29; Response to DF at ¶ 29; PF at ¶ 2; Response to PF at ¶ 2). As office accountant, she was responsible for paying jurors, all monthly accounts receivable, accounts payable, and general ledger; reconciling nine checking accounts on a monthly basis; receiving funds paid to the Clerk's Office; and, depositing funds into a local bank. (DF at ¶¶ 30-32; Response to DF at ¶¶ 30-32). Harkins views this position as a "high priority" position because she believes money issues are the most likely to plague the government office. (DF at ¶ 35; Response to DF at ¶ 35). Accordingly, Harkins—acting as the new Court Clerk—interacts with the office accountant on a daily basis and requires the accountant to seek direction from her whenever a problem is encountered for which the Deputy Clerk has not been given specific instructions. (DF at ¶¶ 34, 36; Response to DF ¶¶ 34, 36). Plaintiff asserts that her roles as Deputy Clerk and accountant were primarily ministerial in nature with clearly-defined duties and no policymaking function. (PF at ¶¶ 3, 21; Response to PF at ¶¶ 3, 21).

3

On January 2, 2009, Harkins' first official act as Clerk was to terminate Plaintiff from employment. (PF at ¶ 19; Response to PF at ¶ 19). At the time, the Clerk's Office consisted of nine employees under Harkins' supervision. (DF at ¶ 37; Response to DF at ¶ 37). Plaintiff believes that she was terminated because she ran against Harkins. (DF at ¶ 27; Response to DF at ¶ 27). Although Harkins had claimed she terminated Plaintiff because of her attitude and work performance, she has since embraced Plaintiff's theory for termination for the purposes of this motion. (PF at ¶ 23; Response to PF at ¶ 23).

On February 23, 2010, Plaintiff filed her Complaint [1] against Lumpkin County and Harkins in both her individual capacity and official capacity as the Lumpkin County Superior Court Clerk. (Dkt. No. [1] at 1). She alleged pursuant to 42 U.S.C. § 1983 that her termination from employment was "in retaliation for the exercise of her [First Amendment] rights of political association, to speak on matters of public concern, and to participate in the political process." (Id.) On October 26, 2010, Defendants filed their Motion for Summary Judgment [34]. Plaintiff filed her Brief in Opposition To Defendants' Motion for Summary Judgment [41] on November 17, 2010. On December 6, 2010,

4

Defendants filed their Reply Brief in Support of Their Motion for Summary

Judgment [44].

## Discussion

### I.     Threshold Matters

In Plaintiff's Brief in Opposition to Defendants' Motion for Summary

Judgment [41], Plaintiff concedes that Harkins is not liable in her individual

capacity because she is entitled to qualified immunity, and that Lumpkin

County is not liable because Harkins was not acting on its behalf. (Dkt. No. [41]

at 3). Therefore, the only claim for the Court to address on this motion for

summary judgment is whether Harkins is liable in her official capacity as Clerk.


### II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). "The moving party bears 'the initial responsibility of informing the …

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.'" <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (alteration in original) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986) ("[T]he [non-movant] must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

The applicable substantive law identifies which facts are material. <u>Id.</u> at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. <u>Id.</u> An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Patton v. Triad Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Allen</u>

AO 72A
(Rev.8/82)

v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III.   Liability Under § 1983 Against Harkins in Her Official Capacity

Patronage practice has a long history in American politics and government. See Elrod v. Burns, 427 U.S. 347, 353 (1976) ("[Patronage practice] has existed at the federal level at least since the Presidency of Thomas Jefferson … ."). The practice comes in a variety of forms, including appointing loyal supporters to government jobs, providing non-officeholders lucrative government contracts, and favoring certain wards over others for improved public services. Id. The practice at issue here is the dismissal of public employees seeking candidacy for an elected position.

The Supreme Court in Elrod directly addressed the issue of whether "individual public workers' employment conditioned on supporting a political party" is constitutional. Randall v. Scott, 610 F.3d 701, 711 (11th Cir. 2010).

7

The Court held that "conditioning the retention of public employment on the employee's support of the in-party … must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." Id. (omission in original) (quoting Elrod, 427 U.S. at 363). Although the Court recognized vital governmental needs for efficiency, effectiveness, and assurance that policies which the electorate has sanctioned are effectively implemented by loyal employees, "such dismissals are on balance not the least restrictive means for fostering" those ends and are not sufficient "to override their severe encroachment on First Amendment freedoms." Elrod, 427 U.S. at 372–73. In effect, whether a government employee is protected by the First Amendment from dismissal is determined by balancing the constitutional rights of employees with government interests in effective performance of job functions. This holding was reaffirmed in Branti v. Finkel, 445 U.S. 507, 518, 520 (1980). In balancing these interests, whether a position requires policymaking or confidentiality is relevant to the determination, but "the ultimate inquiry … is whether the hiring authority can

8

demonstrate that … affiliation is an appropriate requirement for the effective performance of the public office involved."[1] Id. at 518.

For decades, whether First Amendment protection extended to political candidacy was an uncertain issue. See Randall, 610 F.3d at 710 ("Precedent in the area of constitutional protection for candidacy can be best described as a legal morass."). The Eleventh Circuit in Randall, however, extended Elrod and Branti so that candidacy is indeed entitled to protection. Id. at 713. That case

---

[1]The Supreme Court announced a parallel analysis for free expression principles in Connick v. Myers, 461 U.S. 138, 150–51 (1983), and Pickering v. Bd. of Educ., 391 U.S. 563, 574–75 (1968). Overlap between the tests may occur, but the Eleventh Circuit has "emphasized the need to 'retain the distinctions between' the two types of cases." Taylor v. Bartow County, 860 F. Supp. 1526, 1539 (N.D. Ga. 1994) (quoting Terry v. Cook, 866 F.2d 373, 377 (11th Cir. 1989)). Indeed, there seems to be an ambiguity on which test to apply in the context of party candidacy. "[I]t appears that the political patronage analysis applies to situations involving *en masse* discharge, while the *Pickering/Connick* balancing test applies when only a single employee is affected." Id. Other courts distinguish the two lines of inquiry so that "the *Elrod-Branti* standard [applies] for discrimination based on political affiliation and [the other] balancing test [applies] for discrimination based on political speech." Cutcliffe v. Cochran, 117 F.3d 1353, 1355 (11th Cir. 1997). Both tests, however, require a court to "reach the most appropriate possible balance of the competing interests." Connick, 461 U.S. at 150; see also Elrod, 427 U.S. at 363 (requiring a court to balance interests). For the purpose of this motion for summary judgment, the Court will use the Elrod-Branti test because it was briefed by the parties and the Eleventh Circuit used it in Randall to analyze the amount of First Amendment protection afforded to an individual employee's candidacy. Randall, 610 F.3d at 711–14. Furthermore, "public employment … absolutely conditioned upon political allegiance and not upon the content of expressions of political beliefs" makes "the *Elrod-[B]ranti* analysis … the appropriate one." Terry, 866 F.2d at 377. Here, given that the campaign was not contentious and did not involve much political discourse, the Elrod-Branti analysis is more appropriate to analyze the case. (DF at ¶¶ 9, 11; Response to DF at ¶¶ 9, 11).

AO 72A
(Rev.8/82)

arose after an employee of the Clayton County District Attorney entered the

Clayton County Board of Commissioners' Chairman race, a position also

sought by the District Attorney's husband. Id. at 703. Although it was

acknowledged that there was no circuit precedent that squarely fit the facts of

that case, the Eleventh Circuit concluded that "[a]n interest in candidacy … lies

at the core of values protected by the First Amendment." Id. Therefore, "the

constitutional-right-versus-the-state's-interests analysis [is] no different for a

restriction on candidacy than a restriction on candidate support." Id. The

Eleventh Circuit cited a number of candidate support (rather than actual

candidacy) cases to find all such employees are entitled to *some* constitutional

protection, although the degree of loyalty required for effective job performance

"depends upon the actual responsibilities of [a given] position and the

relationship … to the [supervisor]." Id. at 712–13 (quoting Terry v. Cook, 866

F.2d 373, 377–78 (11th Cir. 1989)). Therefore, the Court must determine

whether Harkins can show that Plaintiff's loyalty as Deputy Clerk and the

office accountant was sufficiently important to outweigh Plaintiff's

constitutional rights.

　　　　In Defendants' Brief in Support of Their Motion for Summary Judgment

[34-1] and Defendants' Reply Brief in Support of Their Motion for Summary

Judgment [44], Harkins argues that "summary judgment is appropriate in this matter even if one embraces Plaintiff's theory of the case, i.e., that Superior Court Clerk Harkins terminated Plaintiff as a result of her seeking the office of Superior Court." (Dkt. No. [34-1] at 2). Harkins justifies her decision through the "viper in the nest" argument, i.e., termination was justified because of "the 'potential' problems attendant with the successful candidate retaining the losing candidate." (Dkt. No. [44] at 13). In effect, Harkins argues that the fact Harkins and Underwood were political opponents justified Plaintiff's termination because Plaintiff might otherwise be able to "sabotage" Harkins' management of the office, thus adversely affecting Harkins' candidacy in the future. Harkins claims her suspicions were further supported because Plaintiff "never congratulated Harkins on her victory," "at no time communicate[d] that she wanted to work for her," and "never communicated that she would support Ms. Harkins." (Dkt. No. [34-1] at 7-8). Plaintiff responds that her termination was unjustified because her roles as accountant and Deputy Clerk did not require confidentiality or policymaking and emphasizes "that Underwood did not challenge Harkins for an office currently held by Harkins" at the time of the campaign. (Dkt. No. [41] at 17–18). For the reasons discussed below, the Court

AO 72A
(Rev.8/82)

finds Harkins' interest in office loyalty to outweigh the First Amendment

protection of Underwood's candidacy.

Several courts have addressed whether an employee can be reprimanded

for running against a newly-elected supervisor rather than an incumbent. For

example, in <u>Myers v. Dean</u>, the plaintiff unsuccessfully campaigned for the

position of county clerk, which was filled by the defendant after the

incumbent's resignation and until a new clerk could be elected. 216 F. App'x

552, 553 (6th Cir. 2007). After the defendant won the election, he terminated

the plaintiff. <u>Id.</u> Although the court acknowledged that candidacy might deserve

greater protection, Sixth Circuit precedent compelled it to hold that the

plaintiff's candidacy was not protected by the First Amendment from

retaliation. <u>Id.</u> at 554–55. Similarly, in <u>Summe v. Kenton County Clerk's</u>

<u>Office</u>, the Eastern District Court of Kentucky held that the newly-elected

county clerk was not liable under § 1983 for his termination of the plaintiff, a

deputy clerk who had run against the defendant during the campaign. 626 F.

Supp. 2d 680, 683–84, 693 (E.D. Ky. 2009). The court found significant in

determining the appropriateness of political affiliation for patronage dismissal

"(1) the inherent duties of the position in question and (2) the duties that the

new holder of that position will perform as envisioned by the newly elected

12

official."[2] Id. at 686 (quoting Hoard v. Sizemore, 198 F.3d 205, 212 (6th Cir.

1999)) (internal quotation marks omitted) .

Precedent within the Eleventh Circuit also cautions against extending First

Amendment protection for candidacy too far. In Stamps v. Watson, No. 3:05-

CV-40(CAR), 2005 WL 1926604, at *1 (M.D. Ga. Aug. 11, 2005), a clerk in the

Madison County Tax Commissioner's Office lost in her campaign against her

supervisor for the position of Tax Commissioner. After losing the election, the

new Tax Commissioner terminated the clerk on the grounds of insubordination.

Id. The court held that "Defendant … did not violate Plaintiff's First

Amendment rights in terminating … an employee who had challenged her for

the position currently held by Defendant." Id. at *4. The court reasoned that,

"[d]ue to the close working relationship between the parties" in the same office

and the necessity for frequent communication about office matters requiring a

decision, there was a "great potential for actual or threatened disruption of the

fulfillment of the responsibilities and duties of the office." Id.

---

[2]Another basis for not finding the plaintiff's candidacy protected was that Sixth
Circuit precedent compels a determination that candidacy is not protected absent
"political beliefs, expressions, affiliations, or expression of opinion." Summe, 626 F.
Supp. 2d at 692. In contrast, Eleventh Circuit precedent provides candidacy *some* First
Amendment protection. Randall, 610 F.3d at 703, 712. As discussed below, however,
the First Amendment's protection of Plaintiff's candidacy is insufficient to outweigh
Harkins' interest in office loyalty.

13

Furthermore, the Eleventh Circuit in <u>Randall</u> referenced a situation similar to the one here: "[I]f [Plaintiff] decided to run against [the district attorney] for [the district attorney's position], [the district attorney] would have a good legal reason to discharge him due to the state's interest in office loyalty." 610 F.3d at 714. It is uncertain whether this hypothetical applies only to a situation where the supervisor is an incumbent.  However, given that <u>Randall</u> involved a case in which the plaintiff ran against a non-incumbent, it is reasonable to infer that the Eleventh Circuit meant its language to reference the present situation. Therefore, Underwood's attempt to limit the applicability of the "viper in the nest" theory to only situations where an employee runs against her supervisor fails.  Indeed, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate, and an employer need not allow events to unfold to the extent that the disruption of the office and … working relationships is manifest before taking action." <u>Stamps</u>, 2005 WL 1926604, at *3 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 152 (1983).[3]

---

[3]Plaintiff's attempt to compare the case to <u>Calvert v. Hicks</u>, 510 F. Supp. 2d 1164 (N.D. Ga. 2007), is unpersuasive. In <u>Calvert</u>, the county clerk terminated a deputy clerk for supporting the defendant's political adversary. <u>Id.</u> at 1167. The court used the <u>Elrod-Branti</u> test to hold that political loyalty is not an appropriate requirement for deputy clerks because (I) the Fulton County civil service code

Although Plaintiff argues that Defendant lacked a significant interest to terminate Plaintiff and that loyalty is not an appropriate job requirement because the accountant position *before* her termination lacked policymaking or confidentiality requirements, Harkins is entitled to envision new duties of the position and not be bound by the *status quo ante*. See <u>Summe</u>, 626 F. Supp. 2d at 686 (reasoning that whether political loyalty is required for a position is partially determined by the position's duties as a newly-elected supervisor so envisions). Indeed, under Georgia law, deputy clerks are employees of the clerk of the superior court rather than county employees, so there is significant deference for a county clerk to set her own employment procedures and job requirements. See <u>Taylor v. Bartow County</u>, 860 F. Supp. 1526, 1536 (N.D. Ga. 1994) (noting that employment policies for deputy clerks are set by county clerks); O.C.G.A. § 15-6-59(b) (2010) (stating that "clerks of the superior courts

---

prohibited the plaintiff's dismissal except for cause and (II) the plaintiff's position was not one "of particular trust and confidence, [but rather] was closely supervised." <u>Id.</u> at 1173–74. <u>Calvert</u> is distinguishable. First, Plaintiff admits that her position was not protected by the Lumpkin County's civil service system. (Dep. Underwood, Dkt. No. [35] at 94:22–23). Second, candidacy was not the issue in <u>Calvert</u>, so the <u>Calvert</u> court's determination that the supervisor's interest in loyalty did not sufficiently outweigh the plaintiff's interest in *supporting* a candidate does not apply here. Also, as discussed below, Harkins, as the newly-elected County Clerk, was entitled to alter the responsibilities of her deputy clerks. A determination that deputy clerks in one county do not have sufficient responsibilities to justify patronage dismissal does not preclude a determination that the responsibilities of deputy clerks in other counties under different supervision justify political loyalty.

15

shall have the power to appoint a deputy or deputies … [, whose] powers and duties shall be the same as those of the clerks, as long as their principals continue in office and not longer"). There is no dispute that the new accountant works with Harkins daily and that they communicate frequently. (DF at ¶¶ 33–36; Response to DF at ¶¶ 33–36).

Like in <u>Stamps</u>, 2005 WL 1926604, at *4 (citing <u>Connick</u>, 461 U.S. at 152), this appears to be a situation in which there is a close working relationship that creates a "great potential for actual or threatened disruption of the fulfillment of the responsibilities and duties of the office." The small number of employees in the office only exacerbates the potential for disruption. <u>See</u> <u>Carver v. Dennis</u>, 104 F.3d 847, 849, 853 (6th Cir. 1997) (holding a deputy clerk in a two-person office was not protected from dismissal when she ran against the only other person in the office, the county clerk); <u>Warren v. Gaston</u>, 55 F. Supp. 2d 1230, 1232, 1236 (D. Kan. 1999) (finding the plaintiff's interest in candidacy outweighed by "the county's interest in avoiding conflict in the small-office environment of the clerk's office," which was made up of around six employees). Accordingly, Harkins was entitled to act on her belief that retaining Underwood would compromise "the effective performance of the public office involved." <u>Calvert</u>, 510 F. Supp. 2d at 1169 (quoting <u>Branti</u>, 445 U.S. at 518).

16

## Conclusion

For the aforementioned reasons, Defendants' Motion for Summary

Judgment [34] is **GRANTED**. The clerk shall close the case.

**SO ORDERED**, this  16th  day of June, 2011.


_____
**RICHARD W. STORY**
United States District Judge

17